

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Joyce K. McDonald*
*Assistant United States Attorney*
*Joyce.McDonald@usdoj.gov*

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4899
MAIN: 410-209-4800
FAX: 410-962-3091

April 27, 2023

✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

**12:59 pm, May 09 2023**

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

*Via Email to RBardos@shg-legal.com*

Richard B. Bardos, Attorney
Shulman, Hershfield & Gilden PA
Suite 904
1 East Pratt Street
Baltimore, MD 21202

> Re:   United States v. Stephen L. Franklin
> Criminal No. DKC-21-~~038~~  **DKC 21-328**

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Stephen L. Franklin, Defendant (hereafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **May 2, 2023**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offenses of Conviction

1.      The Defendant agrees to plead guilty to Counts 1 and 9 of the Indictment, which charge the Defendant with conspiracy to commit wire fraud and aggravated identity theft, in violation of 18 U.S.C. §§ 1349 and 1028A(1). The Defendant admits that he is, in fact, guilty of those offenses and will so advise the Court.

### Elements of the Offenses

2.      The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

### Conspiracy to Commit Wire Fraud

a.      First, that in the District of Maryland, there was a scheme and artifice to defraud and to obtain money and property from Shore Appliance Connection, Inc., by materially false and fraudulent pretenses, representations, and promises using interstate wires and



SCANNED
5/9/2023

b. Second, that the Defendant knowingly and willfully conspired and agreed with at least one other person to participate in the scheme and artifice to defraud.

<u>Aggravated Identity Theft</u>

a. First, the Defendant knowingly aided and abetted the use of a means of identification of another person;

b. Second, the Defendant aided and abetted the use of the means of identification during and in relation to a wire fraud scheme in violation of 18 U.S.C. § 1343;

c. Third, the Defendant knew that the means of identification was that of an actual person; and

d. Fourth, the Defendant acted without lawful authority.

<u>Penalties</u>

3. The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessm't |
|-------|---------|----------------|----------------|--------------------|--------------|--------------------|
| 1 | 18 U.S.C.§1349 | 0 years | 20 | 3 years | $250,000 | $100 |
| 9 | 18 U.S.C.§1028A | 2 years consecutive | 2 years consecutive | 1 year | $250,000 or 2X the gross gain | $100 |

a. Prison: If the Court orders a term of imprisonment for the wire fraud offense, then imprisonment for Count 9 is required to be consecutive. The Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

2

e.    Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.    Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

### Waiver of Rights

4.    The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.    If the Defendant had persisted in his plea of "not guilty," the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.    If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.    If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.    The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.     If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.     By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.     If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h.     By pleading guilty, the Defendant will also be giving up certain valuable civil rights including the right to possess a firearm, hold or obtain certain licenses, and vote.

<u>Advisory Sentencing Guidelines Apply</u>

5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

6.     This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

a.     This Office and the Defendant further agree that the applicable base offense level for wire fraud conspiracy is 7 pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2X1.1(a); § 2B1.1(a)(1). Sixteen (16) levels are added because both the actual and intended losses caused by the Defendant's fraud are more than $1,500,000 but less than $3,500,000. U.S.S.G. § 2B1.1(b)(1)(I). Two levels are added because the offense resulted in substantial financial hardship to the victims. U.S.S.G. §2B1.1(b)(2)(A). Two levels are added because the Defendant abused a position of public trust, *i.e.*, his status as a licensed notary, in the commission of the offense. U.S.S.G. §3B1.3. Before downward adjustments, the total offense level is 27.

b.     This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. §3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way. If the Defendant qualifies for all the adjustments for acceptance of responsibility, the adjusted offense level is **24.**

c.     As to Count Nine, the parties stipulate that the Court is required to impose a sentence of two years' incarceration, consecutive to any period of imprisonment imposed on Count One. U.S.S.G. § 2B1.6

7.     There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.     Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

<u>Obligations of the Parties</u>

9.     At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

<u>Waiver of Appeal</u>

10.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any

ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statutes to which the Defendant is pleading guilty are unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statutes, to the extent that such challenges legally can be waived.

    b.  The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

    c.  The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum.

    d.  The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

Forfeiture

    11.  The Defendant understands that the Court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order will include assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property subject to forfeiture.

    12.  Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities: a money judgment in the amount of **$506,548.67** representing the proceeds the Defendant obtained as a result of the wire fraud scheme.

    13.  The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. This Office agrees to seek the Attorney General's approval to apply forfeited assets to the Defendant's Restitution Order.

    14.  The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of

the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15.     The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Restitution

16.     The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses, which the parties stipulate is **$1,850,488.94.** The Defendant's liability is stipulated to be joint and several with the co-defendant, Duane G. Larmore. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

Defendant's Conduct Prior to Sentencing and Breach

17.     Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement; and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this

Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw his guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea if the Court finds that the Defendant breached the Agreement.

<u>Court Not a Party</u>

19.    The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

<u>Entire Agreement</u>

20.    This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

*Evelyn P. Cusson*  Digitally signed by EVELYN CUSSON
Date: 2023.04.27 18:24:54 -04'00'

Joyce K. McDonald
Evelyn Cusson
Leo J. Wise
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_5/9/23_
Date

_____
Stephen V. Franklin


I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that he understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

_5/9/23_
Date

_____
Richard B. Bardos, Attorney

# STATEMENT OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all the evidence that would have been presented had this matter proceeded to trial.*

## Background

As of 2015, Stephen Franklin (hereafter "Franklin" or "the Defendant") was a Salisbury, Maryland businessman. He was the chief operating officer of Accurate Optical, a chain of optometric shops on the Eastern Shore of Maryland, which offered eye examinations, contact lenses, frames, and eyeglasses. In addition, the owners of Accurate Optical and the Defendant purchased East Coast Optometric, a chain of South Carolina optical shops. Both East Coast Optometric and Accurate Optical had bank accounts at Bank of America, Salisbury, and the Defendant was a signer on both accounts. The Defendant and Duane Larmore (hereafter "Larmore") met through the Salisbury Chamber of Commerce and became friendly.

Shore Appliance Connection, Salisbury, Maryland, was founded in 1951. In 1999, Victim #1 and his wife Victim #2 purchased the store and incorporated the business as Shore Appliance Connection (hereafter "Shore Appliance") in Maryland. Shore Appliance sold household appliances such as kitchen appliances, heating and air conditioning units, grills, washers and dryers as well as mattresses and bedding. Shore Appliance banked with Hebron Savings Bank, Hebron, MD. Victim #1 and Victim #2 were the directors of Shore Appliance, and Victim #1 was its president. Duane Larmore, the son of Victim #1 and Victim #2, was a signer on the Shore Appliance bank accounts ending in ***0406 and ***1301 at Hebron Savings Bank, and he kept the books for the company. Larmore was not a corporate officer or corporate owner of Shore Appliance.

On September 23, 2016, Lloyds Bank PLC returned the initial $100,000 investment to the East Coast Optometric account at Bank of America ending in ***0454 because the name on the Lloyds Bank account did not match the named beneficiary on the wire transfer form completed by the Defendant. On that same day, the Defendant returned those funds to Shore Appliance using East Coast Optometric's Bank of America account ending ***0454 to wire transfer the funds. The Defendant told Larmore that he would find another investment opportunity because this one wasn't going to work. At this point, Shore Appliance was out $100,000 from the wire transfer to T.H.

The Defendant and A.R. then discussed another investment opportunity with Larmore, which they again promised would bring quick returns. This investment required $95,000 to lease a "stand by letter of credit" ("SBLC") to be issued by Barclays Bank, U.K., which would be "monetized" to purchase jet fuel from Simpatrans, a Romanian company. The $95,000 investment was supposed to secure the use of a $40 million SBLC to be issued by Barclays Bank, which in turn would enable the investor to purchase and re-sell large quantities of jet fuel from the Romanian company to be furnished to third parties such as Fed Ex.

A.R. provided to the Defendant a copy of a Deed of Agreement between GENFINANCE II PLC and Russell Advisory Group dated October 6, 2016. The Defendant and A.R. provided a copy of the Deed of Agreement to Larmore. According to the agreement, a $95,000 investment would result in a $40 million SBLC lease. Neither Franklin nor Larmore had $95,000 personally. The Defendant and Larmore agreed to split the returns 50-50 from the investment because while Larmore would supply the investment funds from Shore Appliance, Franklin had brought the investment to Larmore.

On October 11, 2016, Larmore wire transferred $95,000 of Shore Appliance's funds to the East Coast Optometric account at Bank of America and thus into the Defendant's control. The

## Larmore and the Defendant Used Shore Appliance's Funds to Make Investments and Did Not Discuss the Investments With Shore Appliance Owners

In 2016, the Defendant introduced Duane Larmore by telephone to A.R. A.R. was affiliated with a federal agency, the General Services Administration, where he managed government real estate. A.R. had a business he operated on the side called Russell Advisory Group. In telephone conversations with Larmore, the Defendant and A.R. discussed with Larmore an opportunity for him to invest in an oil deal which promised quick and substantial returns. A.R. claimed to know a "Caleb Vincent," the son, or a friend of the son, of the Nigerian oil minister who could obtain lucrative oil contracts for them. A.R. pitched an initial investment in the amount of $100,000 to the Defendant. The Defendant did not have $100,000. The Defendant knew that Larmore could obtain the investment funds from Shore Appliance. At no time did the Defendant speak to the owners of Shore Appliance, Victim 1 and Victim 2, to present the investment opportunity to them or to assure himself that Victim 1 and Victim 2 approved of this use of Shore Appliance's funds.

On September 14, 2016, Larmore wire transferred $100,000 from the Shore Appliance account ending in ***1301 at Hebron Savings Bank to an East Coast Optometric account at Bank of America ending in ***0454, an account controlled by the Defendant. Later that day, September 14, 2016, the Defendant wire transferred $100,000 from the East Coast Optometric account to an account in the name of Caleb Arinze Unachukwu ending in ***0651 at Lloyds Bank PLC in the United Kingdom. These funds represented an investment in the oil deal.

On September 20, 2016, at the Defendant's urging, Larmore wire transferred another $100,000 from the Shore Appliance ***1301 account to T.H., purportedly an attorney for the oil deal, at account ***8985 at JPMorgan Chase Bank, West Palm Beach, Florida.

Defendant immediately transferred $95,000 from the East Coast Optometric account to the account of "Jiokers [sic] Services UK Ltd" at Barclays Bank, London, United Kingdom. The recipients of the wire transfer emailed A.R., a copy of what purported to be the $40 million SBLC issued by Barclays Bank on October 24, 2016. A.R. shared the email and the attached SBLC with the Defendant who in turn shared it with Larmore. The Defendant and Larmore then learned that the $95,000 payment was not sufficient to obtain the SBLC.

In order to obtain an SBLC, the Defendant told Larmore that an additional $300,000 would be required. The Defendant knew from Larmore that Larmore could not remove an additional $300,000 from Shore Appliance's account without disrupting the cash flow of Shore Appliance. As described in more detail below, in order to obtain the additional $300,000, the Defendant urged Larmore to use factoring companies, which Larmore did.

### The Defendant Assisted Larmore in Finding New Sources of Funds for Shore Appliance to Make More Money Available for Investments for Larmore and the Defendant.

The Defendant had experience with factoring companies from his work at Accurate Optical and East Coast Optometric where the Defendant had borrowed operating funds from factors by pledging the optical companies' accounts receivable. The Defendant explained to Larmore that factoring companies would provide large sums of money to Shore Appliance secured by Shore Appliance's accounts receivable. The Defendant knew that the downside of using factors for business financing was that while the factoring companies would make substantial advances based on accounts receivable, they in turn would require that money be withdrawn through the automated clearing house (ACH) process from the borrowing business's bank account every business day to repay the funds plus substantial excess funds to pay the factors for the cost and risk of using the factors' monies. In addition, Larmore, through Shore Appliance, would have to pay brokers who help arrange the factoring relationships. The Defendant provided Larmore with the names and

4

contact information for factoring companies knowing that Larmore intended to borrow against Shore Appliance's accounts receivable to fund the investment offered by A.R. and the Defendant.

Larmore applied for a factoring contract for Shore Appliance which would encumber Shore Appliance's accounts receivable without the approval of the owners, corporate directors, and officers of Shore Appliance and for the purpose of concealing the missing $195,000 that Larmore had already taken and to obtain the additional $300,000 for the purported insurance contract and second SBLC. The Defendant encouraged the borrowing to complete the funding for the deal. Larmore used Victim #1 and Victim #2's identities without their knowledge or permission to complete the factoring contract. The Defendant knew, or willfully blinded himself to the fact, that Larmore did not have the permission of Victim #1 and Victim #2 to use their identities. The Defendant never spoke with Victim #1 or Victim #2 about either the investment opportunity or the entry into factoring contracts.

Larmore entered into factoring agreements with S.O.S. Financial on November 2, 2016, for $250,000 and on November 3, 2016, with Rapid Advance for $200,000. Larmore contracted with S.O.S. Financial by using Victim #1 and Victim #2's identities, and Franklin falsely notarized the forged signatures of Victim #1 and Victim #2. The Defendant knew that the funds he was helping Larmore obtain from factors using Shore Appliance's assets would be used to fund the purported insurance and second SBLC, from which Franklin expected to receive 50% of the returns. The Defendant did not attempt to talk with either Victim 1 or Victim 2 before he notarized their forged signatures. The Defendant made no attempt to assure himself that Victim 1 and Victim 2 were aware of how Larmore and the Defendant were planning to use Shore Appliance's funds and that Victim 1 and Victim 2 approved of this use of Shore Appliance's funds.

a civil lawsuit to recover the funds. After the transfer of the $300,000, Shore Appliance was out $495,000, plus Shore Appliance was fraudulently obligated on factoring contracts with Rapid Advance and Power Up Lending.

Franklin and A.R. told Larmore that A.R. would need to travel to England and Spain to attempt to recover the funds. In November and December 2016, Larmore wire transferred approximately $37,000 from the Shore Appliance ***1301 account to A.R. for purported expenses and travel abroad to recover the $395,000. A.R. told the Defendant that the trip was unsuccessful.

None of the investments that the Defendant pitched to Larmore has ever paid any return.

On January 5, 2017, the Defendant wire transferred $25,000 from Bank of America account ***0454 in the name of East Coast Optometric, which Larmore used for the January payroll of Shore Appliance. Franklin told the Accurate Optical owners that he was involved with an investment group that dealt with international commerce and that he intended to purchase Accurate Optical.

As a result of the two factoring contracts, the factors debited Shore Appliance's bank account on every business day to recover their advances plus their charges. On June 14, 2017, the constant cash drain on Shore Appliance's bank account caused Larmore to find a new factor, Next Wave Funding, which advanced $360,000 to Shore Appliance to pay off the remaining monies owed to Power Up Lending and Rapid Advance and provide additional cash to Shore Appliance. After the transaction, Shore Appliance was again subject to daily drafts on its bank account to repay Next Wave Funding. The Defendant was aware of the new factoring company and the new influx of cash into Shore Appliance.

From July to December 2017, the Defendant asked Larmore to provide $40,000 in wire transfers of Shore Appliance's funds to East Coast Optometric. Larmore knew that Victim #1 and

On November 7, 2016, S.O.S. Financial transferred $247,000 to the Shore Appliance ***1301 account at Hebron Savings Bank. Also on November 7th, Rapid Advance transferred $197,010 to the same account. Still on November 7th, Larmore transferred $300,000 from the Shore Appliance ***1301 account at Hebron Savings Bank to the East Coast Optometric account ***0454 account at Bank of America controlled by Franklin. That day, the Defendant wire transferred the $300,000 from the East Coast Optometric account to the account ending in ***8989 of Getesi Trading Co., Ltd., 65 Des Vouex Road, Central Hong Kong at DBS Bank (Hong Kong) Limited, 11/F, The Center 99 Queen's Road Ce, Hong Kong Island, Hong Kong. The Defendant had obtained the banking coordinates for Getesi Trading from overseas contacts of his and A.R.'s.

S.O.S. Financial realized that Larmore, on Shore Appliance's behalf, had borrowed from more than one factor and demanded its money back. Larmore posed as Victim #1 in a recorded telephone call with S.O.S. Financial.

Larmore forged Victim #1's signature on an agreement with yet another factor, Power Up Lending, for funding, and on the accompanying Addendum No. 1 and Confession of Judgment. Larmore emailed these documents to the Defendant. The Defendant notarized Victim #1 and Victim #2's forged signatures on the Confession of Judgment and emailed the documents back to Larmore. On November 10, 2016, Larmore returned $241,520 to S.O.S. Financial, and on November 15, 2016, Power Up Lending deposited $195,550 into the Shore Appliance bank account at Hebron Savings Bank.

After the transfer of the $300,000 to Hong Kong, the purported recipients claimed that they had not received the funds. The Defendant complained to Bank of America; however, Bank of America records showed that the funds had been successfully wire-transferred. The Defendant never reported the $300,000 as stolen to law enforcement authorities and did not attempt to bring

6

Victim #2 would not approve of transferring these funds to prop up Accurate Optical and East Coast Optometric, and the Defendant made no effort to speak with the owners of Shore Appliance to assure himself that the owners knew of, and approved, the transfer of Shore Appliance funds to Accurate Optical and East Coast Optometric. The Defendant did not sign promissory notes on behalf of East Coast Optometric to Shore Appliance to promise to repay the funds. Indeed, the financial condition of Accurate Optical and East Coast Optometric was worsening.

### The Change to the Factor, Itria Ventures, Occurred in November 2017.

In November 2017, Larmore switched Shore Appliance to a different factor, Itria Ventures (Biz2Credit), which advanced $415,000 to Shore Appliance in two separate transactions. Itria Ventures funds were divided between payments to retire Shore Appliance's obligations to Next Wave Funding and to provide Shore Appliance with additional funds in the amount of $299,200. Itria Ventures required that the agreements between Itria and Shore Appliance be signed by Victim #1 and Victim #2, and that Victim #1 and Victim #2 personally guarantee the repayment of the funds and sign Confessions of Judgment. Larmore forged Victim #1's signature on the contract and confession of judgment and provided copies of the drivers' licenses of the owners to Itria Ventures. Larmore turned the contracts and confessions of judgment over to the Defendant who falsely notarized both Victim #1 and Victim #2's signatures and returned the documents to Larmore. Larmore provided the original documents to Itria Ventures.

In addition, Itria Ventures required its representative to confirm by telephone with Victim #1 and Victim #2 their intention to be bound by the factoring agreement. In November 2017, Larmore posed as Victim #1 on an interstate telephone call and purported to authorize the Itria Ventures factoring arrangement. Larmore told the Defendant that he had no one to pose as Victim #2. Franklin connected Larmore to an Accurate Optical employee, Employee #1 to make the call.

funds, Larmore would not have been able to make payroll, and the missing Shore Appliance funds, the investments, and the factoring contracts would have become known to the Shore Appliance owners.

In February 2019, the Defendant closed the Millsboro, DE Accurate Optical location. On February 19, 2019, Accurate Optical was facing eviction from its main office in Salisbury, MD. At the Defendant's request, Larmore wrote a check for $60,000 to Accurate Optical Employee #1, who deposited the funds into her personal bank account. Employee #1 then purchased a cashier's check in the amount of $54,819.28, which was provided to one of the owners of Accurate Optical to pay the rent and the arrears.

In February 2019, the Defendant introduced Larmore by telephone to I.P. and E. P-S. I.P. and E. P-S were purportedly attempting to recover assets in the custody of U.S. Customs, which is a part of the Department of Homeland Security. The Defendant represented to Larmore that he had been told that one could obtain assets re-patriated from overseas by paying outstanding customs duties on them. The Defendant made a number of plane trips to the Dallas area, but the Defendant was never able to take custody of the assets. Larmore separately transferred funds to E. P-S and I.P. to make purported payments of U.S. Customs duties. U.S. Customs denies the existence of cash containers which E. P-S and I.P. claimed to exist.

In July 2019, Accurate Optical was evicted from its Salisbury, MD offices and its equipment was put into storage; Larmore used funds from Shore Appliance to rent the storage facility and to hire UHaul trucks to move the equipment and office furniture.

In September 2019, Larmore caused Shore Appliance to enter into a factoring arrangement with Biz Fund. According to those terms, Biz Fund advanced $322,500 to Shore Appliance's bank account. Biz Fund paid off nothing to Itria Ventures, and Shore Appliance continued to owe

The Defendant understood what Larmore needed Employee #1 to do because of the Defendant's previous false notary of Victim 2's signature. On November 17, 2017, Employee #1 posed as Victim #2 in an interstate telephone conversation with an Itria Ventures representative to falsely confirm the approval of Victim 2 for the factoring contract.

### The Defendant Introduced New Investments for Larmore to Make with Shore Appliance's Funds to Attempt to Recoup Shore Appliance's Missing Money.

Between February and May 2018, the Defendant closed four offices in South Carolina due to continuing financial problems with Accurate Optical and East Coast Optometric. In 2018, the Defendant introduced two new investments to Larmore which were intended to provide large, quick returns for the benefit of Larmore and the Defendant. At the Defendant's suggestion, and without the approval of the owners of Shore Appliance, on July 16, 2018, Larmore wire transferred $35,000 from the Shore Appliance bank account to W.S., and on July 20, 2018, Larmore wire transferred $50,000 to Gateway Capital.

In October and December 2018, Larmore obtained new factoring contracts with Itria Ventures in the increased total amount of $785,000. These agreements paid off the previous factoring contracts and advanced new funds. Itria Ventures again required signed notarized agreements, and again, the Defendant falsely notarized the signatures of Victim #1 and Victim #2, even though the Defendant knew by then that Larmore did not have the permission of Victim #1 and Victim #2 to make the investments. Itria Ventures also required another telephone verification with Victim #1 and Victim #2. Larmore posed as Victim #1, and on October 23, 2018, Accurate Employee #1 again posed as Victim #2 in an interstate telephone call. That phone call occurred on October 23, 2018.

On January 9, 2019, the Defendant wired $25,000 from Accurate Optical Company of Laurel to the Shore Appliance bank account at Bank of Delmarva account ***3237. Without these

money to Itria Ventures. Despite Biz Fund's collection of over $100,000 in charges and fees from Shore Appliance, as of March 2020, Shore continued to owe Biz Fund an additional $128,185, according to the agreement made by Larmore posing as Victim #1 and Victim #2.

Shore Appliance had two lines of credit which would cover its cash needs: $500,000 at Hebron Savings Bank and $500,000 at The Farmers Bank of Willard. Larmore's embezzlements and factoring arrangements caused Shore Appliance to be short of cash. To conceal the embezzlements and the factoring agreements, Larmore caused Shore Appliance to take cash advances on its lines of credit in November 2016 for $40,000, in June 2017 for $30,000, and in September 2019, for $200,000. As of March 2020, Shore Appliance still owed $208,394.92 in principal and interest on these lines of credit.

In January 2020, Larmore caused Shore Appliance to enter into a factoring agreement with IOU Financial. In a conversation recorded by IOU Financial, Larmore posed as Victim #1 and spoke with representatives of IOU Financial. IOU Financial advanced $61,513.55 to Shore Appliance and paid $70,190 to the prior factor Itria Ventures (a/k/a Biz2Credit) to settle that agreement.

## Use of Shore Appliance's Funds for the Defendant's Businesses

The Defendant and Larmore had a long-standing friendship, but the Defendant knew that Larmore was not personally wealthy or well-paid. The Defendant asked Larmore to advance Shore Appliance funds to the Defendant for use by the Defendant in meeting the business expenses of Accurate Optical and East Coast Optometric which were both in a downward spiral. These money transfers were not memorialized with promissory notes or any other instrument. The Defendant used some of the funds to pay salaries of Accurate Optical's employees in cash or to pay Accurate Optical's rent because Accurate Optical's bank accounts were subject to liens for non-payment of

debt. As described above, the Defendant on two separate occasion re-paid $25,000 to Shore Appliance for a total of $50,000.

## Total Losses

In March 2020, Shore Appliance officers and owners planned to review the books and records of Shore Appliance in preparation for their retirement. Larmore realized that the scheme to misuse funds of Shore Appliance and conceal the missing cash through factoring contracts and draws on Shore's lines of credit would be discovered. On April 24, 2020, Larmore was interviewed by the FBI and confessed. The Defendant had previously deleted his telephone text messages with Larmore and A.R. and directed Larmore to do the same.

In all, Larmore paid **$739,295.28** of Shore Appliance's funds, without the officers and owners' knowledge or consent, to invest in investment schemes introduced to him by the Defendant which never paid any money back. Of that amount, **$395,000** was moved *through* bank accounts controlled by the Defendant. The Defendant received an additional **$111,548.67** of Shore Appliance's funds as a result of Larmore's transfer of funds to the Defendant or bank accounts controlled by the Defendant. An additional **$60,000** of Shore Appliance's funds were paid to a subordinate of the Defendant's for her use in paying Accurate Optical's rent. Although the Defendant may have hoped to repay Shore Appliance, Accurate Optical had no realistic prospect of repaying the funds to Shore Appliance.

Larmore and the Defendant caused Shore Appliance to lose an additional **$731,250.07** in fees and other payments to factors and to factoring brokers. Larmore and the Defendant caused Shore Appliance to draw on its bank lines of credit and pay extra interest to those banks in the amount **$208,395**. Thus, the factoring arrangements and advances on Shore Appliance's lines of

credit in total caused Shore Appliance to lose in actual funds **$939,645.** However, Shore Appliance as of March 2020 still owed the factors almost $270,000.

For all of the Defendant's and Larmore's conduct, actual cash losses to Shore Appliance totaled **$1,850,488.94** and intended losses totaled **$2,137,674.74.** The losses in chart format are:

| Total Loss to Shore Appliance from Franklin/Larmore Scheme | Cash Loss Amount | Intended Loss Amount |
|---|---|---|
| **Category #1** | | |
| **Cash Misapplied from Shore Appliance by Franklin/Larmore** | | |
| Fraudulent Investments | $739,295.28 | $757,295.28 |
| Monies to Franklin/Franklin's Businesses | $171,548.67 | $171,548.67 |
| | | |
| **Category #2** | | |
| **Costs to Shore Appliance for Franklin/Larmore to Conceal the Misapplication & Raise Cash** | | |
| Factoring Companies + Brokers | $731,250.07 | $1,000,435.87 |
| Lines of Credit + Interest | $208,394.92 | $208,394.92 |
| | | |
| **Total** | **$1,850,488.94** | **$2,137,674.74** |

\*\*\*\*\*\*\*

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

**5/9/23**
Date                                          Stephen L. Franklin

I am Mr. Franklin's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

**5/9/23**
Date                                          Richard B. Bardos, Attorney